[2 Wash. C. C. 487.] [1]

Circuit Court, D. Pennsylvania. Jan., 1811.

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

---

PENNS v. KLYNE.    See Case No. 10,935.

---

## Case No. 10,945.

### The PENNSYLVANIA.

[31 Leg. Int. 237; [1] 13 Am. Law Reg. (N. S.) 561; 10 Phila. 283; 21 Pittsb. Leg. J. 197; 1 Am. Law T. Rep. (N. S.) 402; 6 Leg. Gaz. 236.]

District Court, E. D. Pennsylvania. July 21, 1874.

SALVAGE—SERVICE BY PASSENGER.

1. The rule of maritime law that a passenger that has no opportunity to leave a vessel in distress cannot render a salvage service may admit of a qualified exception where he has promoted her safety by an extraordinary and peculiar service which he was not compellable to render. But, in admitting such an exception in favor of a passenger, the greatest caution is necessary, and especially so where he is of the nautical profession.

[Approving Towle v. The Great Eastern, Case No. 14,110.]

2. Where a passenger of the nautical profession who has rendered such service afterwards assumed and exercised illegitimate authority over the vessel, though the circumstances were not such that he incurred an absolute forfeiture of the salvage compensation, its amount was nevertheless materially reduced by reason of such usurpation of authority.

[This was a libel and amended libel by Cornelius L. Brady against the steamer Pennsylvania (the American Steamship Company, claimants) for salvage.]

C. M. Neal and Rufus E. Shapley, for libellant.

Morton P. Henry and Theodore Cuyler, for claimants.

CADWALADER, District Judge. A vessel manned and otherwise fitted for a voyage is often spoken of as having an organized representative or artificial personality. A public armed vessel represents the sovereignty of the nation to which she belongs. A

[1] [Reprinted from 31 Leg. Int. 237, by permission.]

merchant vessel represents a little private community. It is a definite organized portion of the social system of her nation. Judges, on both sides of the Atlantic, have assimilated such a vessel, when on the high sea, to a floating portion of this nation's territory, of which, though temporarily detached, it continues to be a part. Her internal relations are determined by its laws, and her external relations by the laws of the sea, which constitute a part of the system of universal jurisprudence. Under certain qualifications, her exterritoriality is through international comity, recognised, even when she is in foreign territory.

These observations, in part, explain the remark of Montesquieu, that mariners are citizens or inhabitants of the vessel. They cannot rightfully leave her, unless their association with her is legally at an end, through the conventional termination of their voyage, or otherwise. Till then they can be compulsorily detained in her. The relation of a passenger to a vessel is different. If a sailor has been rightly described as an inhabitant of the vessel, and as in subjection to her government, a passenger may be compared to a mere sojourner in her who is only in temporary subjection. A passenger, while on board, may, indeed, be considered as one of her company, but not in the same light as one of her crew. The passenger may leave her at his pleasure, if an opportunity occurs before the end of this conventional passage; and may do so even in time of danger, however great. For this reason, if the vessel is in distress, and a passenger who has an opportunity of leaving her chooses to remain on board, he may stand afterwards, upon a question of salvage service, nearly or quite in the same relation as if he were not associated with her at all. He may therefore entitle himself to compensation of the nature of salvage by rendering even service of ordinary bodily labor, as in pumping or otherwise. But where he has had no such opportunity of dissociating himself from the vessel, he is, in time of danger, compellable to render, to the utmost of his ability, like service with any other person of her company; and, as to such service, cannot have any claim of salvage. It by no means follows that a passenger peculiarly capable of rendering extraordinary service, far beyond that of one of a good crew, is, in all cases whatever, compellable to render it, or that, if he does render it with useful effects, he cannot, in any case, become entitled to compensation of the nature of salvage. We may suppose the case of a ship, or her cargo, partially on fire, the ship having on board a passenger who is a chemist, with a sort of travelling laboratory. He may have, in this laboratory, the probable means of checking the fire, but perhaps not without some risk, to himself and others, of increasing the danger. If, by professional skill and judgment, under the authority of the nav-

igator of the vessel, the chemist makes the experiment, and there is a successful result, is he to receive no compensation? If he should be compensated, is not the compensation for a service of the nature of salvage?

The decision in the case of the steamer Great Eastern answers the question. When that vessel was three hundred miles from land her paddle-wheels were disabled, so that she could be moved by the screw alone. While she was in this condition, the rudder shaft was broken, and was disconnected from the steering gear, so that she became quite unmanageable. Her officers in vain endeavored to substitute and secure some appliance by which to work the shaft. A passenger, who was a mechanician, then devised, and, with the consent of the master and the assistance of the crew, executed a plan for the purpose, which was successful. This was done by a skilful use and adaptation of fixtures, tackle and apparel of the vessel herself. For the service $15,000 was decreed to the passenger as salvage. [Case No. 14,-110.] The reason of the decision was that this highly beneficial service had been peculiar and extraordinary, and such as he was not compellable to perform. This decision is, I think, right in principle. But it establishes what must be considered as an exception from a rule. The rule is that a passenger cannot be a salvor. The exception, lest it should engender litigation, and promote insubordination, must not be admitted without the greatest caution. Especially must such caution be observed where the passenger is of the nautical profession.

In the present case, a large steamer, worth perhaps half a million of dollars, with passengers and a cargo, having four officers, besides the master, encountered, in mid-ocean, a tempest of great violence. During the storm, when changing watches at midnight, she shipped a heavy sea which stove in the forward hatches, and swept away the house forward, carrying overboard the master and first and second officers, with two of the crew. So long as any officer of a vessel is on board, and not disabled, there can be no suspension of the executive authority of her internal government. Therefore, at this crisis the command legally devolved at once upon the third officer. He, however, did not assume it, but was for some time fully and usefully engaged in securing the forward hatches, or in superintending the securing of them. The fourth officer had been previously disabled, and was not on duty. The wheel was fully and properly manned, but this was at no time otherwise. But there was no officer of the deck surviving, and there was urgent necessity for such an officer to give directions to the men at the wheel. It was a crisis of great peril. There was, at all events, great seeming danger; and it would now be mere idling to inquire speculatively how far actual danger may really have ex-

isted. The after-born supposed wisdom from such a retrospect might be arrogant folly. There certainly was also great alarm, with ample supposed cause; and a general panic, if not prevented, might have soon ensued; and this might, in its consequences, have been dangerous, if not disastrous.

At this crisis the libellant intervened meritoriously. He was on board simply as a passenger, who, as such, had paid his fare. He was a competent professional master navigator, with former experience in the command of sailing-vessels and of steamers. He went to the wheel-house and promptly assumed command or direction there, doing whatever was necessary and proper for the exigency. He thus averted, until the termination of the storm, whatever danger may have been caused by the unfortunate loss of the master. I think that this was a salvage service. The difficulties in the way of so deciding are great. But those in opposition to such a contrary decision would be greater. It is true that when the third officer succeeded of right to the command of the vessel, he might have ordered the libellant to take the watch during the emergency. The libellant would certainly have been compellable to go to the wheel-house. If he had been directed, when there, to act as officer of the deck, it would, I think, have been his duty to obey, and to execute his office to the best of his ability. Had he done so, under such orders, I do not, as at present advised, think that it would have been a salvage service. But without orders, he was not compellable to decide who should have the watch, or to take upon himself the direction, with its cares and responsibilities. At the crisis of danger there was no means of organizing the internal government of the vessel, unless through immediate energetic action of the third officer. That officer did not thus act. The libellant was, therefore, justifiable, under the law of maritime necessity, in acting upon his own responsibility, as officer of the deck. There was, at this time, therefore, no usurpation of unlawful authority by him. This being so, his conduct thus far was meritorious and highly beneficial; and the service was, under the circumstances, extraordinary. It was a peculiar service for one who was not of the crew to take the command of the watch without being assigned to it.

On the next morning, the storm having ceased or abated, and no special danger continuing to exist, the chief engineer and purser, and some others on board, without consulting the third officer, whose authority alone they should have recognised, wrongfully assumed upon themselves to offer the command of the vessel to the libellant, and urgently invited him to assume it as master. He very improperly did so. He did not consult the third officer, but nominated him as first officer. It is contended that the third officer acquiesced in what would thus other-wise have been usurpation. An English judge has recently said that quiescence is not acquiescence. Mere enforced submission certainly is not. The third officer here submitted, but did not acquiesce. The libellant continued to act in this usurped relation of master of the vessel for several days, until she reached the port of destination. On her arrival, the owners, who are here defendants, gave thanks, in writing, to the libellant, as for extraordinary services, and offered him what would have been a liberal gratuity for meritorious conduct if he had been an officer of the vessel. But the amount offered was greatly below the least possible estimate of compensation for a salvage service. He now alleges that he became of right master of the vessel, and thus rendered a continuing salvage service. This unfounded pretension is, of course, rejected.

The question then arises, whether through his usurpation of the command of the vessel after the storm, he has incurred a forfeiture of the salvage compensation to which he was otherwise entitled for his prior service. I do not think that, under the peculiar circumstances of the case, an absolute forfeiture of the whole amount was incurred retroactively by his assumption and exercise of the illegitimate authority. But the effect of this usurpation must necessarily be to reduce very materially the amount which would otherwise be awardable to him. What the reduced amount ought to be is not easily determinable. I have hesitated between three thousand and four thousand dollars, and have determined on the greater sum partly because I think that the defendants' letter of thanks almost invited the litigation which has followed, and though not so intended, must have induced a high estimate by the libellant of the value of the service. Costs are adjudged to the libellant; but under the head of depositions, taxable costs will not be allowed to an amount exceeding two hundred dollars. The testimony is of great bulk, but of no proportionate weight; and its excess in bulk ought not to be allowed to swell the costs.

Decree for libellant for four thousand dollars, provided that, under the head of depositions, costs exceeding two hundred dollars will not be taxed or allowed.